993 A.2d 742

**Deon Arnell TURNER**

v.

**STATE of Maryland.**

**No. 2934 Sept.Term, 2007.**

Court of Special Appeals of Maryland.

April 29, 2010.

48

50

Allison M. Sayers (Nancy S. Forster, Public Defender, on the brief), Baltimore, MD, for Appellant.

Gary E. O'Connor (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: HOLLANDER, JAMES R. EYLER and LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

In January 2008, Deon Arnell Turner, appellant, appeared for trial in the Circuit Court for Talbot County, without counsel. A jury convicted him of driving a motor vehicle with

a revoked license, driving without a license, and speeding.[1] Because appellant was a subsequent offender, the court imposed a sentence of three years' incarceration for driving on a revoked license.[2] By Order dated August 19, 2009, the circuit court granted appellant's Motion to Correct Illegal Sentence, reducing that sentence to two years.

On appeal, appellant presents a quartet of questions, which we have rephrased slightly:

1. Did the trial court properly find that appellant knowingly and voluntarily waived his right to counsel when the court failed to advise appellant of the maximum penalties, including subsequent offender penalties, of the crimes for which he was charged?

2. Did the trial court illegally sentence the appellant to three years incarceration for driving with a revoked license when the maximum penalty under the statute is two years incarceration?

3. Did the trial court erroneously admit evidence of the speed registered on a laser detector when the State failed to prove that the laser was properly tested and in good working order?

4. Was the evidence sufficient to sustain the appellant's conviction for speeding?

For the reasons that follow, we shall reverse the judgment and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

Trooper Scott Laird was the State's sole witness. He was on duty in Talbot County on June 6, 2006, monitoring the speed of motor vehicles on westbound Route 50. He testified that at approximately 11:45 a.m., he observed a blue 2002 Ford sport utility vehicle ("SUV") that seemed to be traveling

---

1. The State nol prossed the charge of driving on a suspended license.

2. The court merged the offense of driving without a license and did not impose a sentence for the speeding conviction.

faster than the posted speed limit of 55 miles per hour. Accordingly, Trooper Laird activated his laser, a ProLaser III; it indicated a speed of 73 miles per hour for the SUV. The trooper then "stood out in the roadway and signaled for that vehicle to pull over." Appellant, the driver, complied with the directive and "identified himself as Deon Arnell Turner. . . ." At trial, Trooper Laird identified appellant as the person he pulled over for speeding.[3]

Thereafter, the trooper ran a check of appellant's Motor Vehicle Administration ("MVA") records, and learned that appellant's license was "suspended and revoked." State's Exhibit 1, a copy of appellant's driving record, showed that appellant's driver's license had been revoked on June 4, 2002.[4] His license was also revoked on February 2, 2005, and it was still in revoked status on June 6, 2006. Trooper Laird confirmed that State's Exhibit 1 corresponded to "what dispatch informed [him] about the revocation status of Mr. Turner's license on June 6, 2006[.]"

On cross-examination, the following ensued:

[APPELLANT]: . . . you said I was driving a . . . blue vehicle, right, blue 2000 Ford SUV? [5]

[TROOPER LAIRD]: That's correct.

[APPELLANT]: At this time, Your Honor, I'd like to stop my cross examination and put on my own witness, Terrez Smith on the stand to shoot [sic] his testimony in the matter of the color of the SUV showing that there's a discrepancy in his testimony.

---

**3.** The trooper also testified that he was certified to operate the laser and that he checked its accuracy before and after he stopped appellant.

**4.** State's Exhibit 1 was admitted, without objection. Immediately thereafter, appellant objected. The court noted, "it's already been admitted into evidence, but if you want to cross examine the officer about its authenticity I will allow you to [do] that when it's your turn."

**5.** On direct examination, Trooper Laird said that appellant was driving a *2002* Ford SUV. The parties later stipulated that the vehicle was a 2002 Ford Explorer.

THE COURT: All right, well, the Court will allow your witness to testify, but we can't, we can't do that until the State is finished with this witness. . . .

After the State rested, appellant called Terrez A. Smith. He stated that he loaned his black Ford Explorer to appellant on June 6, 2006. Appellant showed Smith several photographs of a black SUV. Smith confirmed that it was his vehicle, and that it was the one he loaned to appellant on the date in question. The photographs, Defendant's Exhibits 1 through 12, were admitted into evidence.

After Smith testified, Turner stated that Trooper Laird improperly identified a

blue vehicle speeding at a high rate of speed, not a black vehicle. And his, and his testimony should be called into question. That's why I was after the testimony of the witness and I filed . . . a motion to the court to dismiss. Because there's no probable cause for this, . . . .

At the bench, the following exchange ensued:

[PROSECUTOR]: . . . [T]here are no ownership issues regarding any of the citations Mr. Turner was issued. They all have to do with his license status and his being the operator of a motor vehicle on a day, it doesn't really matter for purposes of the State's proof which motor vehicle it was as to how it was titled or to whom it was titled.

THE COURT: . . . I understand that, but I . . . understand his argument to be that since this vehicle that's been identified in the photographs is black and the officer testified it was, they're both 2002 Ford SUV's.

[APPELLANT]: Yeah.

THE COURT: The officer described it as blue and the evidence, at least from this witness would indicate that it was black, so . . .

[PROSECUTOR]: Your Honor, the State accepts Mr. Smith's testimony that that's what color his vehicle is and that's the make and model of the vehicle.

**54**

After further discussion, the court advised the jury as follows:

THE COURT: ... [W]e arrived at a stipulation ... which is that there's no issue, everybody agrees, both the prosecution on the one hand and Mr. Turner on the other that the vehicle that's pictured in those 12 photographs belongs to this gentlemen [sic], Mr. Smith, and that if he were to go out to his car and retrieve a registration and title that it would verify that he is the duly registered owner of the vehicle in the pictures and it's, it's a 2002 Ford Explorer and it's black in color....

Appellant's uncle, Thomas Frison, was asked "what vehicle" appellant "was in?" He stated: "You was in I think it's a 2002 black Ford Explorer." Frison added that he was "[p]retty much positive."

Laird then testified in rebuttal.[6] The prosecutor asked whether "the notes that you would have taken about, like the make and model of the vehicle that you testified to earlier, that sort of thing, would that, would I be right in saying that would have been done after you cleared the scene and completed that?" Laird responded, "Yeah, it was done at the barrack."

On cross-examination, Laird confirmed that the tag number for the incident in question was the same as the tag number of Smith's car, as depicted in the photographs. Laird also stated: "I stopped your vehicle, I shot your vehicle with the laser, I seen your vehicle, I stepped out in the roadway and stopped the vehicle that I shot." The following dialogue ensued on redirect:

[PROSECUTOR]: Trooper, you write down the notes and then you take the information from your notes for the citations at the barrack, is that correct?

---

**6.** The court asked appellant if he had any other witnesses. Appellant responded that he did not, and the court asked: "[I]s there any rebuttal, Madam State's Attorney?"

[TROOPER LAIRD]: Well, in this case he was placed under arrest. I received the MVA printout of the vehicle information and the driver information and I used that [sic] do my, do my statement of probably [sic] cause, which I did.

[PROSECUTOR]: Now, the vehicle information, is that something that was generated by your calling in as your [sic] looking at the vehicle on the scene?

[TROOPER LAIRD]: That's correct.

[PROSECUTOR]: Okay, so to go back, you make a visual observation that you believe Mr. Turner's [going] over 55, but then you confirm that by activating your laser, is that correct?

[TROOPER LAIRD]: That's correct.

[PROSECUTOR]: And you received a 73 in a 55 reading?

[TROOPER LAIRD]: Yes, ma'am.

\* \* \*

[PROSECUTOR]: What information did you call into dispatch?

[TROOPER LAIRD]: I called in the vehicle tag number, the Maryland tag number and also his driver's license information that was given to me.

When asked to explain the discrepancy as to the color of the SUV, Laird stated: "I never took notes at the scene, went back to the barrack and I typed up my statement of probable cause. Very, very possible I could have made a mistake [as to the color of the SUV]." But, Laird indicated that he gave the correct information to dispatch as to "the make, the model, the tag number."

Appellant then testified.[7] He recalled that while he was driving, Laird "jumped out of the middle of the road and pulled me over ..." Appellant also stated "you know, when somebody, when a person jump out in the middle of the road,

_____

7. We do not know why appellant did not testify until after the State's rebuttal case. In any event, the court found that appellant "made a knowing and intelligent decision to waive his constitutional rights not to testify."

you ain't going to hit them.... [Y]ou just gonna stop." Appellant's testimony did not include any reference to the color of the vehicle he was driving on June 6, 2006.

At the conclusion of the evidence, appellant moved "for dismissal." He argued:

Yeah, for, basically lack of probable cause. The identified vehicle that the trooper was not the right vehicle [sic]. He did not identify the proper vehicle. Without probable cause there is no driving on suspended, no driving on revoked, nor exceeding the speed limit. Exceeding the speed limit is what the initial probable cause and the color of the vehicle was the, really the basis the foundation of that. Without that and without the credibility of the officer being called into question by three witnesses, who was duly sworn, that I think the, I think the Court should deem it necessary to dismiss the charges for lack of probable cause.

The court denied appellant's motion and the following argument ensued:

[APPELLANT]: Your Honor, if you would look, Your Honor before you make that denial, if you will look, the color the first establishment of that was the blue SUV. If it, if it's established that I was driving a black SUV and [the] officer acknowledges it was a blue SUV speeding, not the vehicle that I was driving. That was not the vehicle I was driving.... [T]he trooper committed perjury....

THE COURT: Well, Mr. Turner, I understand your argument, but he has testified that he, he, although he may well have been mistaken about the color of the vehicle, whether it was blue or black, he's, he's confident and not mistaken, so he says, about whether you were the man that was driving the vehicle. He's identified the vehicle by tag number. The tag number matches up with the vehicle that everybody seem [sic] to agree you were driving. So in the Court's view, that doesn't amount to a lack of probable cause to stop you in the first place and your motion will be denied....

## DISCUSSION

### I.

Appellant first contends that he did not knowingly and voluntarily waive his right to counsel. Noting that he had been convicted of driving on a suspended or revoked license in 2005, appellant complains that, prior to his decision to proceed without counsel, the district court and the circuit court "never advised [him] about potential subsequent offender penalties," as required by Maryland Rule 4–215. Before setting forth the parties' contentions in detail, we pause to review additional facts pertinent to this issue.

Appellant appeared in the District Court for Talbot County after his arrest on June 6, 2006. On August 14, 2006, appellant again appeared in that court. The court postponed the matter so that appellant could obtain an attorney. Stephanie A. Shipley, Esquire, entered her appearance on September 27, 2006. On January 17, 2007, appellant requested a trial by jury, and the case was transferred to the Circuit Court for Talbot County. In addition, appellant indicated that he wanted to represent himself, with Ms. Shipley acting as his "co-counsel." The court informed the appellant that this matter would be addressed by the circuit court.[8]

At a pretrial hearing on April 13, 2007, Ms. Shipley moved to strike her appearance, explaining that she "had no way of contacting or communicating with the defendant" and that appellant "failed to attend the last two scheduled office conferences."[9] Appellant consented to Ms. Shipley's motion. The following exchange transpired:

---

8. On March 9, 2007, Ms. Shipley filed a plea of not criminally responsible ("NCR"). But, the NCR plea was immediately withdrawn at appellant's request.

9. Appellant also faced charges in three other cases. Ms. Shipley represented appellant in two of them. In Case No. 20–K–07–8721, appellant was charged on August 17, 2006, with second degree assault; malicious destruction of property; and false imprisonment. In Case No. 20–K07–8755, he was charged on November 25, 2006, with false imprisonment and second degree assault. In Case No. 20–K–07–8837,

THE COURT: All right, Mr. Turner, you then stand here without counsel this morning. You are advised by the Court that you should seek to have counsel represent you in these three matters. These are serious matters. If you cannot afford to hire a private attorney, you should contact the Public Defender's Office and I'm going to give you a form right now that gives you the address of the Public Defender's Office. Either way you should have someone enter his or her appearance in the case.

[APPELLANT]: I will be entering mine.

THE COURT: Pardon?

[APPELLANT]: I will be entering mine, appropriate persona [sic]. I'll be entering my appearance appropriate persona in the matter.

THE COURT: Wait, wait a minute. I don't understand what you're staying [sic].

MS. SHIPLEY: He wants to represent himself.

[APPELLANT]: In my private person.

THE COURT: ... [Y]ou want to represent yourself. Well, I'm telling you, sir, that unless you have legal training, representing yourself may not be a good idea. I would suggest to you that you contact an attorney and I'm also suggesting to you that you contact the Public Defender's Offices [sic], because you're going to enter a not guilty plea and this case, these three cases are going to be set for jury trials. And that means that you need a lawyer to help you represent yourself in these cases.

[APPELLANT]: No, I don't. I don't, I don't think so.

THE COURT: Well, you may not think so, but I'm telling you, sir, that you do. A lawyer can be of assistance to you in every stage of this proceeding. You've never tried a jury trial. You have no legal training, unless you tell me you do.

he was charged on February 16, 2007, with charges similar to those at issue here: driving on a revoked license; speeding; driving/attempting to drive a motor vehicle without required license; and driving on a suspended license.

A jury trial means that we bring a number of people in this courtroom. A jury will be picked by you and your counsel and the State to sit in that jury box over there. That is not something that I think you've ever done before and you need the assistance of a lawyer to help you do that. A jury trial also means that you have to prepare for it. You have to know what you[r] defenses are. You have to research the law. There may be some motions that should be made. A lawyer can help you do all that.

\* \* \*

I'm telling you to get a lawyer to represent you. To enter his or her appearance within 15 days of today's date. We're going to have you back in here for another pretrial ... two weeks from today, the 27th. . . .

The court and appellant signed an "Advice to Defendant" form, stating that appellant received a copy of the charging documents and was advised of his right to counsel.

On April 24, 2007, the State mailed to appellant a "Notice of Intent to Seek Enhanced Penalty," as required by Maryland Rule 4–245.[10] The Notice, which was silent regarding the particular enhanced penalties that appellant faced, provided:

The State of Maryland, by Ellen Barry Grunden, Deputy State's Attorney for Talbot County, pursuant to the Transportation Article of the Maryland Annotated Code, § 27–101(h)[11] and Maryland Rule 4–245, serves notice upon the

---

**10.** Maryland Rule 4–245 is titled "Subsequent offenders." We set forth the text of Rule 4–245, *infra.*

**11.** MD.CODE (2009 Repl.Vol., 2009 Supp.), § 27–101 of the Transportation Article ("TRANSP") provides, in part:

**§ 27–101. Penalties for misdemeanor.**

\* \* \*

(h) *Penalties—$1,000 and 1 year; $1,000 and 2 years.*—Any person who is convicted of a violation of any of the provisions of § 16–303(a), (b), (c), (d), (e), (f), or (g) of this article ("Driving while license is canceled, suspended, refused, or revoked") . . . is subject to:

(1) For a first offense, a fine of not more than $ 1,000 or imprisonment for not more than 1 year, or both; and

Defendant of its intent to seek increased punishment as authorized by law, and states as follows:

1. The State alleges that the Defendant has previously been convicted of an offense which qualifies as a predicate offense for enhanced penalty purposes. The following information is provided to substantiate the prior conviction(s):

Offense: Driving after License Suspended/Revoked
**Dates of Conviction:** **August 10, 2005**
**July 27, 2005**

2. In the event that the Defendant is convicted of an offense for which the law provides an additional penalty for a second or subsequent offender, the Court will provide said Defendant with an opportunity to be heard and make a determination as to whether the Defendant is a second or subsequent offender as alleged in this notice before imposing a sentence.

On April 27, 2007, appellant appeared for a pretrial hearing, without counsel, and again indicated that he wanted to represent himself. The court asked appellant to state "generally what [the] charges are in these three cases," to which appellant responded, "two counts of second degree assault and . . . driving on a suspended license." [12] After appellant was ad-

---

(2) For any subsequent offense, a fine of not more than $ 1,000, or imprisonment for not more than 2 years, or both.

TRANSP. § 16–303 ("Driving while privilege is canceled, suspended, refused, or revoked"), is also relevant. It states, in part:

(a) *Refused licenses.*—A person may not drive a motor vehicle on any highway or on any property specified in § 21–101.1 of this article while his license or privilege to drive is refused in this State or any other state.

\* \* \*

(c) *Suspended licenses generally.*—A person may not drive a motor vehicle on any highway or on any property specified in § 21–101.1 of this article while the person's license or privilege to drive is suspended in this State.

(d) *Revoked licenses.*—A person may not drive a motor vehicle on any highway or on any property specified in § 21–101.1 of this article while the person's license or privilege to drive is revoked in this State.

12. As noted, appellant faced other charges, unrelated to the charges arising from the events of June 6, 2006.

vised to obtain counsel, the following colloquy ensued:

THE COURT: Do you know what the penalties are for these charges?

[APPELLANT]: Yes.

THE COURT: Okay. You mind telling me what you think they are?

[APPELLANT]: What is it, what ten years? What is it, what is it since this is a jury trial, what is it what, you know what I'm saying?

THE COURT: The penalties are the same whether it's a jury trial or not. If you . . .

[APPELLANT]: Well, it should be what ten years and then the . . .

THE COURT: If you have for each . . .

[APPELLANT]: This, I think it's five. I'm not for sure. I don't have the paper in front of me.

\* \* \*

I mean, I'm, I'm very familiar with my cases.

THE COURT: Well, I've got to go over it on the record anyway. Let me, let's deal with 8720 here.[13] Okay, are they traffic citations, [Mr. State's Attorney]?

[THE STATE'S ATTORNEY]: Your Honor, I, I'm sorry I don't have the files. I'll be happy to look at the Court's file and make a determination.

THE COURT: Okay, no I, well, I've got them. It's just going to take me a minute of time to sit down and read through every one of them.

[THE STATE'S ATTORNEY]: Once again, these are Ms. Grunden's cases.[14]

\* \* \*

---

**13.** We assume that "8720" was a reference to Case No. 20–K–07–008720, i.e., the underlying charges.

**14.** The State's Attorney was standing in for the prosecutor, Ellen Barry Grunden.

**62**

THE COURT: ... Okay, citation, I guess it's count number one, charge is 16–303, driving without a license on January 17th, '07. That case came up here pretty fast. 16–303(c), is that a year?

[THE STATE'S ATTORNEY]: That is a year, Your Honor.

THE COURT: Okay so you're facing a year on that one and/or a fine of a thousand dollars, I think. Okay, here's another charge, this is driving on a revoked license, 16–303(d).

[THE STATE'S ATTORNEY]: That is also a year, Your Honor.

THE COURT: Yeah. Okay, so that's a year on that one, possibly. Then there's driving without a license, which I think is a fined offense only. Same, same date for that. Maximum fine I think is $500 here. Okay, then there's a charge of speeding, which is usually not a jailable offense. Charge is 73 in a 55 mile an hour zone. So conceivably you get points on your license and a maximum fine of $500 on that charge. Okay, I think that's the, that's the charges in 8720....

As the above exchange demonstrates, the court did not advise appellant of the enhanced penalties that he faced as a subsequent offender with respect to the underlying charges.

Michael F. O'Connor, Esquire, entered his appearance for appellant on or about November 26, 2007. Soon after, on December 4, 2007, he filed a Request for Order to Strike Appearance. O'Connor averred:

1. The Defendant refused to sign the application for the services of the Office of the Public Defender. Requesting only that the assigned attorney act as his "co-counsel."

2. The Office of the Public Defender does not have the authority to represent an individual who declines to sign the application nor to act in the capacity as co counsel.

The court granted O'Connor's motion to withdraw on December 4, 2007.

As noted, appellant appeared at trial without counsel. The following colloquy is relevant:

THE COURT: ... I understand you've been advised of your right to have an attorney in this case. Is that correct?

[APPELLANT]: Yes.

THE COURT: And Mr. Turner, I understand that you have elected not to have an attorney, is that correct?

[APPELLANT]: Yes.

THE COURT: And you understand that an attorney could be of help to you in this case, but I gather that it's your feeling that you would, despite the help you might be able to get from an attorney, you think you'd be better off representing yourself.

[APPELLANT]: Yes.

Following the jury's verdict on January 28, 2008, the court immediately proceeded to sentencing. The following exchange is relevant:

THE COURT: ... All right, Mr. Turner I take it that you did receive a copy of this notice of intent to seek enhanced penalty in this particular case?

[APPELLANT]: Yes. But I was wondering do I have to put an objection to it orally or written?

THE COURT: Well I guess the first thing that I need to know is whether you agree or disagree with what the [MVA] record shows.

\* \* \*

The record indicates that there are two prior convictions for driving on a suspended or revoked license. One on August 10, 2005 and another on July 27th, 2005. So the first thing I need to know is whether you agree or disagree ... that that's your prior record?

[APPELLANT]: I ... don't have no (inaudible) record to let you know when the convictions was handed down.

THE COURT: Well aside and apart from when they were handed down do you agree that there are two prior convictions?

[APPELLANT]: I believe there is one to my recollection. One that I received a year for when I was already serving a year. . . .

THE COURT: Well Madam State's Attorney let me ask you this. Under the enhanced penalty provision is one prior conviction the same maximum significance or do we need to be convinced that there are two?

[PROSECUTOR]: One prior would raise the maximum to two years. Two or more priors would raise it to three years.[15]

The prosecutor then referred the court to State's Exhibit 1, appellant's MVA record. Thereafter, the court stated:

[The MVA record] appears to show a conviction on July 27 of 2005 . . . driving after license refused, cancelled, suspended or revoked for which there was a 12 point assessment. And then on August 10, . . . looks like a second conviction for driving after license refused, cancelled, suspended or revoked for which you got another 12 points.

The trial court then imposed sentence, stating:

On the conviction of the most serious offense for driving while revoked, because you have two prior convictions for the same offense and because you have a long traffic record of other unrelated offenses, because the State has in my view properly filed the motion for or notice of intent to seek an enhanced penalty, I believe that as the record stands you are eligible for a three year offense, a three year sentence and that's what the Court is going to impose.

On February 4, 2008, appellant, still self-represented, filed a "Motion To Amend Judgment," pursuant to Rule 2–534. He complained, in part: "That one of my conviction [sic] was

---

**15.** The prosecutor incorrectly stated the maximum penalties for subsequent offenders under TRANSP. § 16–303(d). As noted, TRANSP. § 27–101(h) provides, in part, that a person convicted for a violation of TRANSP. § 16–303 "is subject to: (1) For a first offense, a fine of not more than $1,000, or imprisonment for not more than 1 year, or both; and, (2) For any subsequent offense, a fine of not more than $1,000, or imprisonment for not more than 2 years, or both."

without counsel, therefore it may not be used against me. . . . Use of prior conviction without counsel against person to enhance punishment is forbidden." He noted his appeal on February 11, 2008.

On July 31, 2009, appellant, through counsel, filed in the circuit court a motion to correct illegal sentence, claiming that his three-year sentence was illegal "[b]ecause the maximum penalty for a subsequent violation of § 16–303(d) is only two years incarceration." By Order dated August 19, 2009, the circuit court ruled:

[U]pon consideration of Defendant's Motion to Correct Illegal Sentence, it appearing that the State and Defendant agree that the sentence imposed on Defendant on Monday, January 28, 2008 exceeded the maximum penalty specified for a violation of Md.Code Ann., Transp. § 16–303(d), and that the sentence imposed did, in fact exceed the maximum penalty specified in the Code, it is this 19th day of August, 2009 . . .

ORDERED that the sentence imposed on the Defendant on Monday, January 28, 2008 is vacated pursuant to Maryland Rule 4–345(a); and it is further

ORDERED that a sentence of two years be imposed on Defendant for his violation of Md.Code Ann., Transp. § 16–303(d), this sentence to be effective as of January 28, 2008 and to run from June 12, 2007.

With this background, we turn to review the contentions.

■ Relying on Md. Rule 4–215, appellant argues: "Prior to waiving counsel, the appellant was never advised by the trial court regarding the potential maximum penalty he faced[.]" Therefore, he contends that he "did not knowingly and voluntarily waive his right to counsel. Reversal is required."

Referring to the State's pretrial notice that it was seeking enhanced penalties, appellant contends that the "fact that this Notice references [TRANSP.] § 27–101(h) does not show that the appellant had **actual knowledge** that he was subject to

two years incarceration" for driving on a revoked license. (Boldface in original). He argues:

> A trial judge does not comply with Rule 4–215 by simply referring a criminal defendant to the applicable statute so that he may look up the penalties for himself. As such, the prosecutor's reference to the statutory provision did not serve to give the appellant actual knowledge of the maximum penalties.
>
> Moreover, the statute to which the appellant was referred spans a full nine pages in the "Pertinent Provisions" section of Appellee's Brief. By no means is this a simple statute for a layperson to read. In fact, both the trial judge **and** the prosecutor misread the statute at sentencing and thought that the appellant was subject to three years incarceration rather than two years.... (Boldface in original).

The State observes that the circuit court's "advisement regarding the sentence was correct for a first offense of driving on a revoked license," but concedes that this case involves a subsequent offender, for whom TRANSP. § 27–101(h)(2) authorizes imprisonment "for not more than 2 years...." It also recognizes that Rule 4–215 refers to an advisement by the court, not the State, and acknowledges that the court's advisement did not specify the correct penalty that appellant faced. According to the State, however, "the record shows that Turner had actual notice of a possible subsequent offender penalty." Therefore, it argues that his waiver of counsel was "knowing and intelligent," and "any error in advising [appellant] that he faced a 1–year sentence rather than a 2–year sentence was harmless."

To establish appellant's actual knowledge, the State looks to the pretrial notice it sent to appellant, pursuant to Md. Rule 4–245.[16] It posits: "In this case, the record shows that Turner

---

16. Rule 4–245 states, in pertinent part, as follows:

**Rule 4–245. Subsequent offenders.**

 (a) **Definition.** A subsequent offender is a defendant who, because of a prior conviction, is subject to additional or mandatory statutory punishment for the offense charged.

received the subsequent offender notice before trial, and it was mailed three days before the hearing at which he waived counsel. Because of that actual notice, Turner had his 'eyes open.' *See Knox [v. State]*, 404 Md. [76,] 88, 945 A.2d 638 [(2008) (internal quotations and citations omitted)]."

As the State points out, "review of every opinion of the Court of Appeals citing Rule 4–215 reveals no case in which the Court addressed actual notice provided to the defendant by the prosecutor." Nevertheless, it argues that "the harmless-error argument in this appeal is quite different from previous arguments that the Court of Appeals has addressed." It elaborates: "In this case ... the State is not asking this Court to speculate as to what notice Turner might have received. Instead, the State is asking this Court to rely on record evidence as to what notice he did receive."

Moreover, the State suggests that any error is of no legal consequence, because it is clear that Turner would not have obtained counsel, even if he knew of the actual penalty. It reasons:

> ... Turner was informed that he faced sentences of 10 years for assault, or an unlimited sentence for false imprisonment, in the [unrelated] cases that were discussed at that hearing. If Turner did not obtain counsel after being informed that he faced a 10-year sentence, it seems quite

---

(b) **Required notice of additional penalties.** When the law permits but does not mandate additional penalties because of a specified previous conviction, the court shall not sentence the defendant as a subsequent offender unless the State's Attorney serves notice of the alleged prior conviction on the defendant or counsel before the acceptance of a plea of guilty or nolo contendere or at least 15 days before trial in circuit court or five days before trial in District Court, whichever is earlier.

\* \* \*

(d) **Disclosure of the notice.** After acceptance of a plea of guilty or nolo contendere or after conviction, a copy of the notice shall be filed with the clerk and presented to the court. The allegation that the defendant is a subsequent offender is not an issue in the trial on the charging document and may not be disclosed to the trier of fact without the consent of the defendant, except as permitted in this Rule. . . .

unlikely that he would have obtained counsel if he knew he was facing a 2-year sentence rather than a 1-year sentence.

In suggesting that its subsequent offender notice was sufficient to satisfy Rule 4–215, the State maintains that its position is "consistent with the Court of Appeals's focus on the defendant's knowledge and understanding in analyzing Rule 4–215." It also claims that its view is "consistent with analysis in civil cases indicating that actual notice may be sufficient despite a technical defect in the required notice."

In reply, appellant insists that "the State is unable to establish that the appellant actually knew the penalties he faced when he waived counsel." He contends: "Without actual knowledge, the State's 'harmless error' argument fails." Further, Turner asserts:

> Nowhere in this Notice does the State inform the appellant that he is subject to two years incarceration (instead of a maximum of one year incarceration). It is unclear from the record whether the appellant received this notice prior to the April 27, 2007 waiver hearing. Even assuming that the appellant received this notice prior to the April 27, 2007 waiver hearing and even assuming further that, as a result of the notice, the appellant had actual knowledge that he could be subjected to two years incarceration as a subsequent offender, the fact that the **trial judge and the prosecutor subsequently advised him** on the record that he was only subject to one year in prison ... negated any prior advisement by the prosecutor that he was subject to more than one year as a subsequent offender. (Boldface in original.)

With these contentions in mind, we undertake our analysis.

A defendant's right to counsel in a criminal case is guaranteed by the Sixth Amendment to the United States Constitution,[17] made applicable to the states through the Four-

---

17. The Sixth Amendment to the United States Constitution provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district

teenth Amendment, and Article 21 of the Maryland Declaration of Rights.[18] *See Walker v. State,* 391 Md. 233, 245, 892 A.2d 547 (2006); *Muhammad v. State,* 177 Md.App. 188, 236–37, 934 A.2d 1059 (2007), *cert. denied,* 403 Md. 614, 943 A.2d 1245 (2008). The constitutional right to self-representation is the corollary of the constitutional right to counsel. *Faretta v. California,* 422 U.S. 806, 832, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("the colonists and the Framers, as well as their English ancestors, always conceived of the right to counsel as an 'assistance' for the accused, to be used at his option, in defending himself. The Framers selected in the Sixth Amendment a form of words that necessarily implies the right of self-representation"); *see Gonzales v. State,* 408 Md. 515, 529–30, 970 A.2d 908 (2009); *State v. Campbell,* 385 Md. 616, 626–27, 870 A.2d 217 (2005); *Gregg v. State,* 377 Md. 515, 548, 833 A.2d 1040 (2003).

Nevertheless, the Supreme Court has recognized that, "[w]hen an accused manages his own defense, he relinquishes ... many of the traditional benefits associated with the right to counsel." *Faretta,* 422 U.S. at 835, 95 S.Ct. 2525. Therefore, for a defendant's waiver of counsel to be effective, "the accused must 'knowingly and intelligently' forgo those relinquished benefits." *Id.* (citation omitted). *See Gonzales,* 408 Md. at 530, 970 A.2d 908 ("[A] defendant who wishes to assert the right to self-representation must knowingly and

---

wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

**18.** Article 21 of the Maryland Declaration of Rights states:

That in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defense; to be allowed counsel; to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses for and against him on oath; and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty.

intelligently waive his or her right to an attorney.") Among other things, a defendant choosing self-representation "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835, 95 S.Ct. 2525 (citation omitted). Moreover, "acquiescence in the loss of such a right is never presumed." *Parren v. State*, 309 Md. 260, 263, 523 A.2d 597 (1987) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).

■ Maryland Rule 4–215 "was designed to protect both the right to counsel and the right to self-representation and ensures that decisions to waive counsel would pass constitutional muster." *Campbell*, 385 Md. at 629, 870 A.2d 217. *See Garner v. State*, 183 Md.App. 122, 132, 960 A.2d 649 (2008) ("*'[T]he purpose of Rule 4–215 is to protect that* most important *fundamental right to the effective assistance of counsel*, which is basic to our adversary system of criminal justice, and which is guaranteed by the federal and Maryland constitutions to every defendant in all criminal prosecutions'") (quoting *Parren*, 309 Md. at 281–82, 523 A.2d 597) (emphasis added in *Garner*), *cert. granted*, 408 Md. 148, 968 A.2d 1064 (2009). As the Court of Appeals recently reiterated, it "adopted Maryland Rule 4–215 for purposes of, *inter alia*, providing judges with a roadmap of how to conduct the required waiver inquiry that will safeguard the defendant's constitutional right to counsel and provide the defendant with the essential information necessary to make a decision concerning self-representation." *Brye v. State*, 410 Md. 623, 635, 980 A.2d 435 (2009); *see also Broadwater v. State*, 401 Md. 175, 180–81, 931 A.2d 1098 (2007) (stating that Rule 4–215 "provides an orderly procedure to insure that each criminal defendant ... be represented by counsel, or, if he is not, that he be advised of his Sixth Amendment constitutional right to the assistance of counsel, as well as his correlative constitutional right to self-representation.") (Internal quotations and citation omitted); *Parren*, 309 Md. at 278, 523 A.2d 597 (recognizing that Rule 4–

215 "establishes a comprehensive scheme covering a wide range of matters pertaining to waiver.")

Rule 4–215, which is central to this case, provides, in part:

**Rule 4–215. Waiver of counsel.**

(a) **First Appearance in Court Without Counsel.** At the defendant's first appearance in court without counsel, or when the defendant appears in the District Court without counsel, demands a jury trial, and the record does not disclose prior compliance with this section by a judge, the court *shall:*

(1) Make certain that the defendant has received a copy of the charging document containing notice as to the right to counsel.

(2) Inform the defendant of the right to counsel and of the importance of assistance of counsel.

(3) Advise the defendant of the *nature of the charges in the charging document, and the allowable penalties, including mandatory penalties,* if any.

(4) Conduct a waiver inquiry pursuant to section (b) of this Rule if the defendant indicates a desire to waive counsel.

(5) If trial is to be conducted on a subsequent date, advise the defendant that if the defendant appears for trial without counsel, the court could determine that the defendant waived counsel and proceed to trial with the defendant unrepresented by counsel.

The clerk shall note compliance with this section in the file or on the docket.

(b) **Express Waiver of Counsel.** If a defendant who is not represented by counsel indicates a desire to waive counsel, the court may not accept the waiver until it determines, after an examination of the defendant on the record conducted by the court, the State's Attorney, or both, that the defendant is knowingly and voluntarily waiving the right to counsel. If the file or docket does not reflect compliance with section (a) of this Rule, the court shall comply with that section as part of the waiver inquiry. The court shall

ensure that compliance with this section is noted in the file or on the docket. At any subsequent appearance of the defendant before the court, the docket or file notation of compliance shall be prima facie proof of the defendant's express waiver of counsel. After there has been an express waiver, no postponement of a scheduled trial or hearing date will be granted to obtain counsel unless the court finds it is in the interest of justice to do so.

(Emphasis added).

 In particular, "Subsection (a)(3) exists to ensure that a defendant is made aware of all pending charges and associated penalties." *Brye, supra,* 410 Md. at 637, 980 A.2d 435. As the Court said in *Brye, id.:*

The court must comply with subsection (a)(3) when the accused indicates expressly a desire to waive counsel, *see* Md. Rule 4–215(b) ("If the file or docket does not reflect compliance with section (a) of this Rule, the court shall comply with that section as part of the waiver inquiry."), or when the accused seeks to discharge an attorney whose appearance has been entered on his or her behalf. *See* Md. Rule 4–215(e) ("If the court permits the defendant to discharge counsel, it shall comply with subsections (a)(1)-(4) of this Rule if the docket or file does not reflect prior compliance."). Compliance with the disclosure requirements of Md. Rule 4–215 is necessary to ensure that the defendant knowingly and intelligently waives the right to counsel. *See Fowlkes v. State,* 311 Md. 586, 609, 536 A.2d 1149, 1161 (1988).

 Of import here, the Court of Appeals has emphasized that "Rule 4–215 is a bright line rule," *Johnson v. State,* 355 Md. 420, 452, 735 A.2d 1003 (1999), and compliance with its terms is "strictly mandatory." *Moten v. State,* 339 Md. 407, 411, 663 A.2d 593 (1995). As the Court admonished in *Broadwater,* 401 Md. at 182, 931 A.2d 1098: "[T]he requirements of Maryland Rule 4–215 are 'mandatory and must be complied with, irrespective of the gravity of the crime charged, the type of plea entered, or the lack of an affirmative

showing of prejudice to the accused.'" (Citation omitted). Therefore, "[s]trict, not substantial, compliance with the advisement and inquiry terms of the Rule is required in order to support a valid waiver." *Id.* *See Gonzales,* 408 Md. at 530, 970 A.2d 908 ("Maryland Rule 4–215 ensures that a defendant's waiver of the right to counsel is knowing and voluntary by setting forth mandatory procedures that a trial court in this State must follow when a defendant seeks to assert this right"); *Gregg,* 377 Md. at 554, 833 A.2d 1040 ("[T]he trial court must comply with Rule 4–215 in order for defendant's waiver of counsel to be effective"); *Webb v. State,* 144 Md.App. 729, 741, 800 A.2d 42 (2002) (recognizing that "only full compliance by the trial court will suffice, and the record must reflect such compliance").

Underscoring its unwillingness to deviate from strict compliance with Rule 4–215, the Court of Appeals said in *Johnson,* 355 Md. at 426, 735 A.2d 1003:

> This Court has on several occasions resisted attempts to relax the strictures of Md. Rule 4–215. We believe that any erosion of the rule's requirements would begin the dangerously slippery slope towards more exceptions. The right to assistance of counsel in criminal proceedings is a fundamental right; therefore, we indulge every reasonable presumption against waiver—whether such waiver is expressly made by the defendant or implied through his or her refusal or failure to obtain counsel. Maryland Rule 4–215 exists as a safeguard to the constitutional right to counsel, providing a precise "checklist" that a judge must complete before a defendant's waiver can be considered valid; as such, it mandates strict compliance.

The Court's unwillingness to deviate from strict compliance mandates reversal when Rule 4–215 is not satisfied. *Brye,* 410 Md. at 637, 980 A.2d 435; *see Webb,* 144 Md.App. at 741, 800 A.2d 42 ("The failure of a trial court to conduct a thorough and proper Rule 4–215 inquiry mandates a reversal of the conviction.") (citations omitted); *Smith v. State,* 88 Md.App. 32, 40, 591 A.2d 902 (1991) ("Maryland law

is clear that the provisions of Rule 4–215 are mandatory.... The failure to comply with these provisions constitutes reversible error.") (Citations omitted). Similarly, a violation of Rule 4–215(a)(3) is not harmless error. In *Richardson v. State*, 381 Md. 348, 367, 849 A.2d 487 (2004), the Court said: "Not only is [Rule 4–215] mandatory and subject to strict compliance, its violation cannot be 'harmless error.'" (Citations omitted); *see also Parren*, 309 Md. at 280–82, 523 A.2d 597; *Moten*, 339 Md. at 411–13, 663 A.2d 593.

In this case, it is clear that the court did not satisfy Rule 4–215, because it never accurately advised appellant of the penalties he faced. Nevertheless, the State urges that because appellant had actual notice of the penalties, any error was harmless. We reject the State's suggestion that its pretrial subsequent offender notice, produced pursuant to Rule 4–245, can satisfy the court's mandatory obligations under Rule 4–215. Even assuming, *arguendo,* that the State's pretrial notice could satisfy Rule 4–215, the record here does not support the State's contention that appellant had actual notice of the penalties.

*Brye,* 410 Md. 623, 980 A.2d 435, is useful in providing a framework for our analysis. The State charged Brye, *inter alia,* with second-degree assault, use of a handgun in a crime of violence, and use of a handgun in the commission of a felony. *Id.* at 627–28, 980 A.2d 435. The two handgun crimes constituted violations of MD.CODE (2002, 2008 Supp.), § 4–204(a) of the Criminal Law Article ("C.L."). *Id.* at 638, 980 A.2d 435. C.L. § 4–204(b) provides for a maximum possible penalty of twenty years, as well as a mandatory minimum of five years without parole.

Two different judges gave conflicting advisements to Brye regarding the penalties for the handgun charges. At Brye's arraignment, held over two months before trial, the court overstated the possible penalty for each handgun charge as twenty-five years without parole. *Id.* at 628, 980 A.2d 435. On the morning of trial, Brye sought to discharge counsel. *Id.* at 639, 980 A.2d 435. Before accepting Brye's waiver, the

circuit court incorrectly advised him of the possible penalties for the two handgun charges, underestimating the range of the potential penalty for each charge. *Id.* at 631, 980 A.2d 435. The trial court then accepted Brye's waiver of counsel. *Id.* When Brye requested "a clarification of the charges against him," the court reiterated, in part, that each handgun offense carried a maximum sentence of five years. *Id.* at 631, 632, 980 A.2d 435.

Brye was subsequently convicted of second degree assault, for which he had been correctly advised of the penalties. On the other hand, he was acquitted of the handgun offenses, for which he had been incorrectly advised. Nevertheless, Brye claimed on appeal that his waiver of counsel was invalid because of the incorrect and conflicting advisements he received as to charges for which he was ultimately acquitted. *Id.* at 638, 980 A.2d 435.

The Court concluded that the flawed advisements were "an insufficient predicate under Maryland Rule 4–215 to sustain the court's acceptance of Brye's waiver of counsel." *Id.* at 638, 980 A.2d 435. It reasoned, *id.* at 640–41, 980 A.2d 435:

> Sifting through this litany of confusing and conflicting advisements, we have little confidence that Brye had a clear understanding of the nature of the charges, and their allowable penalties, when he waived his right to counsel. At his first appearance in the Circuit Court, over two months before trial, Brye was advised that he faced twenty years for one of the handgun violations, and twenty-five years for the other. At his next appearance, he was advised that he faced up to twenty-five years "in this case." Finally, immediately before his trial commenced, Brye was advised by the trial judge that the maximum sentence he faced for a handgun violation was five years. While a layperson may be expected to comprehend accurate advisements given cumulatively at separate appearances, we draw the line at expecting a layperson to be able to discern which is the correct advisement from a series of conflicting and often incorrect advisements from different judges. On this record, Brye is not deemed by us as having "effectively

waive[d] counsel" because these advisements did not give him a valid and clear basis from which " 'apprehension . . . of the range of allowable penalties' " may be inferred.

*Knox v. State,* 404 Md. 76, 945 A.2d 638 (2008), also provides guidance, because the Court expressly considered the relationship between Rule 4–215 ("Waiver of counsel") and Rule 4–245 ("Subsequent offenders").[19] The defendant was charged with possession with intent to distribute controlled dangerous substances and possession of controlled dangerous substances. The State served Knox with a " 'Revised Notice of Intent to Seek Enhanced Punishment for Subsequent Offender,' " notifying him that it was seeking enhanced punishment, " 'as authorized by law,' " and listing his prior convictions. *Id.* at 79, 945 A.2d 638 (quoting the State). However, as in this case, the notice did not specify the particular enhanced penalties.

At his initial appearance, the court sought to advise Knox of his right to counsel. *Id.* at 79, 945 A.2d 638. After Knox's first attorney withdrew from the case, Knox appeared for trial without counsel.[20] *Id.* at 79–80, 945 A.2d 638. Regarding the " 'allowable penalties' advice required by Rule 4–215," the trial court stated that the charge of possession with intent to distribute " 'carries a maximum penalty of incarceration of up to 20 years, a fine of up to $25,000 or both,' " and that possession of controlled dangerous substance, not marijuana, " 'carries a maximum penalty of incarceration of up to four years, a fine of up to $25,000 or both,' " while possession of marijuana " 'carries a maximum penalty of incarceration of up to one year, a fine of up to a thousand dollars, or both.' " *Id.* at 79–80, 945 A.2d 638 (quoting the trial court). However, because Knox was a subsequent offender, he was actually subject to a ten year mandatory minimum period of incarceration, with parole limitations. Yet, the trial court did not

---

**19.** The text of Rule 4–245 appears on page 66–67, 993 A.2d at 754, *supra.*

**20.** According to the Court, Knox "appeared essentially *pro se.*" *Id.* at 80, 945 A.2d 638. The Court explained: "His former counsel was present, but had not re-entered his appearance as he had not been paid and he had other court obligations for that day." *Id.*

advise him of the additional penalties to which he was exposed as a result of his subsequent offender status. *Id.* at 91, 945 A.2d 638. After determining that Knox waived his right to counsel, the trial court convicted him of the charges and sentenced him to twenty years incarceration. *Id.* at 80, 945 A.2d 638.

On appeal, Knox argued that he did not validly waive his right to counsel because the trial court failed to advise him of the mandatory penalties he faced as a subsequent offender, as required by Rule 4–215. The Court of Appeals held, *id.* at 88, 945 A.2d 638: " '[A]llowable penalties, including mandatory penalties, if any,' as stated in Rule 4–215, includes notice of subsequent offender penalties." The Court reasoned: "Absent information as to mandatory or enhanced penalties, it could hardly be said that a defendant makes a knowing and voluntary decision to waive counsel with eyes open or with full knowledge of the ramification of the choice." *Id.* (citing *Broadwater,* 401 Md. at 181, 931 A.2d 1098).

To satisfy Rule 4–215, said the Court, a trial court must "advise the defendant that *if* the defendant is a subsequent offender, that there may be enhanced penalties, and [must] recite the possible enhanced penalties." *Id.* at 89, 945 A.2d 638 (emphasis in original). Concluding that a defendant cannot effectively waive counsel without an " 'apprehension … of the range of allowable penalties,' " *Knox,* 404 Md. at 91, 945 A.2d 638 (citation omitted), the Court said, *id.:*

A defendant cannot have full understanding of the consequences of the waiver of counsel if the defendant is unaware of the more severe potential penalties because of prior convictions. A chilling effect, if any, is *de minimis* compared to the surprise at the end of the day when a defendant learns of the mandatory penalty, after trial and just before sentencing. Moreover, the fact that a defendant has prior convictions should not surprise the defendant and advice of enhanced penalties as a result of prior convictions could hardly chill an election to waive counsel and proceed *pro se.*

\* \* \*

A valid waiver of counsel presumes that defendant makes the decision "with eyes wide open."

Of import here, the Court also said, *id.* at 88–89, 945 A.2d 638 (emphasis added):

*The purpose of Rule 4–245 is closely related to the purpose of Rule 4–215, but it does not substitute for Rule 4–215's requirement to inform a defendant of the penalties.* We have stated that the purpose of Rule 4–245 is "to permit a realistic assessment of the consequences of defending the current offense at trial or pleading guilty." *King v. State,* 300 Md. 218, 229, 477 A.2d 768 (1984). Although Rule 4–245 is aimed at fully informing a defendant of the risks inherent at trial, it is not targeted towards the specific goal of insuring that a defendant understands the risks inherent in proceeding without counsel. Rule 4–245 only requires that the State's Attorney "serve a notice of the alleged prior conviction" on the defendant. *In contrast, Rule 4–215 requires that the admonishments be given by a judge, even* if they were given previously by the District Court Commissioner. *Rule 4–245 cannot be a substitute for Rule 4–215 because it does not provide for advice from a judge or advice of the actual severity of the penalties a defendant may face as a result of a prior conviction. . . .*

██ The cases discussed above lead us to conclude that there is no merit to any claim of harmless error based on the State's subsequent offender notice issued to appellant under Rule 4–245. Based on *Knox,* such notice is not a substitute for a proper advisement by the court under Rule 4–215, nor can it cure an erroneous advisement.

██ Even assuming, *arguendo,* that a notice under Rule 4–245 could satisfy the advisement as to penalties required under Rule 4–215, the notice would have to set forth the potential penalties with precision, instead of merely reciting the statute. The State's notice here was wide of that mark. Moreover, there is no basis in the record to support the

State's factual claim that appellant had "actual notice" of the potential penalties.

Of appellant's many appearances in court, possible penalties were only discussed once prior to sentencing, on April 27, 2007. To be sure, Turner stated that he was "very familiar with [his] cases" and knew the penalties. But, when asked to specify the penalties, he did not correctly articulate them. Thereafter, the court proceeded to misinform Turner as to the potential sentences he faced, incorrectly advising him that he faced one year on the charges of driving with a suspended license and driving with a revoked license, as well as ten years for an unrelated charge.

That appellant previously had a lawyer does not alter our view. Prior representation does not give rise to a presumption that counsel informed Turner of the allowable penalties. In *Moten, supra,* 339 Md. at 412, 663 A.2d 593, the Court said: "Although it is perhaps true that attorneys routinely inform their clients of the charges and penalties they face, we cannot fairly assume that this happens in all cases."

Nor are we persuaded that appellant validly waived counsel because, as to the charge of assault in an unrelated matter, he was advised that he faced ten years of incarceration, yet he still waived counsel. As we have seen, in *Brye* the appellant's conviction was reversed because of inaccurate and conflicting advisements about the potential penalties for charges for which he was ultimately *acquitted.* If confusing advisements on corollary charges in the same case are sufficient to establish an ineffective waiver of counsel, then appellant's decision to waive his right to counsel in another case, where he faced a longer potential prison sentence, is not a sufficient basis to find waiver in the case *sub judice.*

For these reasons, we shall reverse the judgment and remand for a new trial.

## II.

In light of our disposition, we need not address appellant's contentions as to an error in sentencing or with

respect to the admission of certain evidence. We shall, however, address his sufficiency claim, because "when a defendant's conviction is reversed by an appellate court on the sole ground that the evidence was insufficient to sustain the jury's verdict, the Double Jeopardy Clause bars a retrial on the same charge." *Lockhart v. Nelson*, 488 U.S. 33, 39, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988) (citation omitted). In other words, the "Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks v. United States*, 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *see Winder v. State*, 362 Md. 275, 324–25, 765 A.2d 97 (2001) (concluding that, if evidence was legally insufficient, double jeopardy bars a retrial); *Markham v. State*, 189 Md.App. 140, 169, 984 A.2d 262 (2009) ("If we agreed that the evidence was insufficient to support any of his convictions, appellant could not be retried on those charges.")

Appellant contends that the evidence was insufficient to sustain his speeding conviction. In particular, he maintains that Laird's testimony was not credible because he claimed appellant was driving a blue SUV when, in fact, appellant proved that he was driving a black SUV. Appellant states: "[I]nasmuch as the trooper, who was the sole witness for the State, could not be sure of the color of the car he targeted with his laser, his testimony must be discredited." Asserting that "[t]he evidence suggests that the Trooper may not have stopped the correct car for speeding," appellant asks us to reverse his conviction.

The standard of review for the sufficiency of evidence is well settled. We must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); *see Rivers v. State*, 393 Md. 569, 580, 903 A.2d 908 (2006); *Moye v. State*, 369 Md. 2, 12, 796 A.2d 821 (2002).

 Notably, factual determinations, such as the reso-
lution of conflicting evidence and weighing the credibility of
witnesses, are always matters for the fact finder. *Longshore
v. State,* 399 Md. 486, 499, 924 A.2d 1129 (2007). As this Court
has said:

> "In an action tried before a jury, it is the jury's task, not the
> court's, to measure the weight of evidence and to judge the
> credibility of witnesses. In performing this role, the jury
> has the power to decide which testimony to accept and
> which to reject. In this regard, it may believe part of a
> particular witness's testimony, but disbelieve other parts of
> that witness's testimony. Moreover, it is the exclusive
> function of the jury to draw reasonable inferences from
> proven facts."

*Smith v. State,* 176 Md.App. 64, 69, 932 A.2d 773 (2007)
(citation omitted). Put another way, the jury is "free to
discount or disregard totally [a defendant's] account of the
incident...." *Binnie v. State,* 321 Md. 572, 581, 583 A.2d
1037 (1991).

Appellant relies on *Kucharczyk v. State,* 235 Md. 334, 201
A.2d 683 (1964), for the premise that, " '[w]hen a witness says
in one breath that a thing is so, and in the next breath that it
is not so, his testimony is too inconclusive, contradictory, and
uncertain, to be the basis of a legal conclusion.' " *Id.* at 338,
201 A.2d 683 (quoting *Slacum v. Jolley,* 153 Md. 343, 351, 138
A. 244 (1927)). As the State points out, *Kucharczyk* has been
narrowly interpreted. *See Bailey v. State,* 16 Md.App. 83, 94,
294 A.2d 123 (1972) ("Some appreciation of the limited utility
of the so-called *Kucharczyk* doctrine may be gathered from
the fact that it was never applied pre-*Kucharczyk* in a criminal
appeal and it has never been applied post-*Kucharczyk* in a
criminal appeal."); *see also Vogel v. State,* 76 Md.App. 56, 59,
543 A.2d 398 (1988) *("Kucharczyk* does not remotely stand for
the proposition for which it is so regularly cited—that margin-
al or even impeachable testimony is entitled to no weight."),
*aff'd,* 315 Md. 458, 554 A.2d 1231 (1989).

In *Kucharczyk*, 235 Md. at 336, 201 A.2d 683, the prosecuting witness was an intellectually disabled 16–year–old boy with a full scale I.Q. of 56. The teen, "who was the only person that testified as to any overt act on the part of the appellant," provided conflicting and inconsistent testimony in response to questions concerning the defendant's culpability. *Id.* at 337, 201 A.2d 683. The Court reversed Kucharczyk's conviction, holding "that there was a lack of credible evidence either to show directly, or to support a reasonable inference of, guilt on the part of the appellant beyond a reasonable doubt, and that therefore the lower court was clearly in error in finding the evidence sufficient to convict." *Id.* The Court explained, *id.*: "Our conclusion flows from the fact that the testimony of the prosecuting witness . . . was so contradictory that it lacked probative force and was thus insufficient to support a finding beyond a reasonable doubt of the facts required to be proven."

Writing for the Court in *Bailey*, 16 Md.App. 83, 294 A.2d 123, Judge Moylan addressed the contours of *Kucharczyk*. He stated, *id.* at 96, 294 A.2d 123 (internal quotations and citations omitted):

Nor does *Kucharczyk* apply where the testimony of a witness is equivocal, doubtful and enigmatical as to surrounding detail. . . . Nor does *Kucharczyk* apply where a witness appears initially to have contradicted himself but later explains or resolves the apparent contradiction. Nor does *Kucharczyk* apply where a State's witness is contradicted by other State's witnesses. Nor does *Kucharczyk* apply where a State's witness is contradicted by defense witnesses.

Similarly, in *Wilson v. State*, 261 Md. 551, 556–58, 276 A.2d 214 (1971), the Court of Appeals held that a witness's testimony, which wholly contradicted the statement the witness gave to the police, was not barred by *Kucharczyk*. The Court explained: "The jury was well aware of the prior inconsistent statement of the witness . . . and was faced with judging her credibility in the light of such inconsistency. That, of course, is a task for the jury rather than the appellate tribunal." *Id.*

at 558, 276 A.2d 214. Almost thirty years after *Wilson,* 261 Md. 551, 276 A.2d 214, in *Pittman v. Atlantic Realty Co.,* 359 Md. 513, 754 A.2d 1030 (2000), the Court of Appeals again rejected the extension of *Kucharczyk.*

More recently, in *Brown v. State,* 182 Md.App. 138, 183, 957 A.2d 654 (2008), this Court highlighted that the lone witness in *Kucharczyk* gave *"internally* inconsistent" testimony. (Emphasis in original). The *Brown* Court said, *id.:*

> The *[Bailey]* Court noted that, "[d]espite the limited utility of the doctrine, the life of *Kucharczyk* has been amazing for the number of occasions on which and the number of situations in which it has been invoked in vain." *Id.* at 95, 294 A.2d 123. Of import here, in reciting a variety of situations in which citation to *Kucharczyk* was inapposite, we began with the example that *"Kucharczyk* does not apply simply because a witness's trial testimony is contradicted by other statements which the witness has given out of court. . . ." *Id.* (eight supporting citations omitted).

We are satisfied that *Kucharczyk's* narrow holding does not extend to the facts of appellant's case. To be sure, the evidence showed that appellant drove a black 2002 Ford Explorer, which he borrowed from Smith. The make and model of Smith's vehicle matched the information on Laird's citation. Laird conceded that he might have been mistaken in recalling that the SUV was blue. He explained that he did not write down the color of the vehicle until he returned to the police barracks. By that point, his memory of the color may have been faulty. But, Laird testified that he did not have to specify the color of the vehicle on the ticket. Notably, he was unequivocal in claiming that Laird operated the SUV that he stopped for speeding, and that he correctly recorded the license plate number of the vehicle on the citation. That number matched the tag on Smith's vehicle.

Moreover, the jury was aware of the discrepancy in the color of the vehicle. It was for the jury to assess Laird's credibility in light of the discrepancy. The jury was entitled

84

to conclude that the issue of the color—whether black or blue—was little more than a red herring.

**JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR A NEW TRIAL. COSTS TO BE PAID BY TALBOT COUNTY.**